Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 10 C 989 | **DATE** | 4/20/2011 |
| **CASE TITLE** | \multicolumn{3}{l}{Patty Young vs. City of Chicago *et al.*} |

**DOCKET ENTRY TEXT**

Defendants' two motions to dismiss [Docket Nos. 14 and 28] are denied. Plaintiff is given leave to file an amended complaint, two weeks from the date of this order, to correct the deficiencies regarding defendant Byrnes and to correct the name of the City in the caption.

■[ For further details see text below.]    Docketing to mail notices.

# STATEMENT

     This is a race discrimination case brought by plaintiff Patty Young individually and on behalf of a class of at least 24 other similarly situated employees at the City of Chicago's Department of Transportation ("CDOT") office located at 2350 W. Ogden in Chicago. The defendants are the City of Chicago and seven individuals working at the Ogden office. The complaint focuses mostly on one individual, Joseph Annunzio, who was the Field Director at the Ogden office and who plaintiff alleges was the key perpetrator of the alleged discrimination. Annunzio is represented by separate counsel from the City and six remaining defendants who are sometimes referred to as the non-Annunzio defendants. Initially, the non-Annunzio defendants filed a motion to dismiss which was fully briefed by the parties. Later, defendant Annunzio filed his own motion to dismiss in which he adopted the arguments in the original motion to dismiss. Plaintiff then filed a response to Annunzio's motion. Annunzio was given a date to file a reply brief, but has apparently not filed a reply.

     The complaint describes three types of wrongdoing allegedly committed by Annunzio at the Ogden office. The first is a series of comments and actions allegedly creating a hostile environment. Specifically, Annunzio referred to black employees as "Nigger" and "Mambo Gorilla;" referred to black females as "Black Bitch;" referred to Asian, Indian, and Hispanic co-workers as "fucking foreigners;" made fun of the accents and appearances of these workers; and draped a cloth over his head and warned black employees that he was the Grand Wizard of the KKK, among other things. (Cmplt. ¶ 21.) Plaintiff alleges that these acts were done "continually and on a daily basis" from January 2005 until early November 2006. (*Id.*) Further these acts typically were done in the "presence of multiple CDOT employees." (*Id.*)

     The second major allegation is that Annunzio assigned plaintiff and the putative class members to work only in South side wards and not in North side wards, which meant they were less likely to receive promotions while at the same time were "forced to work in high crime, gang-infested neighborhoods in the South side" rather than the "safer, more financially affluent neighborhoods on the North side." (¶ 24.)

| STATEMENT |
|---|

The third set of allegations focus on office working spaces and hours. Plaintiff alleges that during the relevant period she and co-workers were segregated from white employees by being given desks "separate and isolated from non-Black employees." (¶ 25.) Further, defendants instituted special office hours that would keep black employees separate from others. (¶ 26.)

Plaintiff alleges that she repeatedly complained about this behavior to the defendants, to all of the City Alderman, to the Local Union 1001, and to the office of Mayor Daley. (¶ 27.) The complaint contains eight counts, based on Title VII and §§ 1983 and 1981, for racial and gender discrimination and for retaliation.

Through the back and forth of the briefing process, the parties have come to agreement on certain lesser issues initially raised, which we therefore need not address now. One minor issue concerns whether the allegations against defendant Thomas Byrnes are specific enough. In her response brief, plaintiff seeks leave to amend her complaint to identify defendant Byrnes in all paragraphs of her complaint where the other individual defendants are identified. Leave is so granted. This leaves three remaining arguments for dismissal of some or all of the claims.

**Supervisory Liability Under *Monell*.** The first issue is whether there are sufficient allegations to hold the City liable for the acts of Annunzio. The parties' general positions are as follows. The non-Annunzio defendants argue that the alleged wrongdoing here was committed by a "single employee" (*i.e.* defendant Joseph Annunzio) within one office inside one department in a large city of many employees. (Reply at 1-2.) Plaintiff responds by emphasizing the egregious nature of the wrongdoing, which covered a 22-month time period, and by pointing out that she and others complained to the Aldermen and Mayor's office.

As accurately summarized in the briefs, the City may not be held liable based on the strict-liability doctrine of *respondeat superior*. *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Instead, plaintiff must prove the City was the "moving force" behind the injury and may do so by establishing one of the three propositions: (1) the City had an express policy causing the deprivation; (2) a widespread practice existed which was so permanent and well-settled that it constituted a custom or practice with the force of law; or (3) the injury was caused by a person with final policymaking authority. *See generally Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001) (summarizing *Monell* requirements). Plaintiff relies on the second and third theories.

In seeking to dismiss the complaint under Rule 12(b)(6), defendants lean heavily on the Supreme Court's decisions in *Bell Atlantic* and *Iqbal* and argue that plaintiff does not have enough concrete detail to justify going forward with discovery as to the non-Annunzio defendants. *See, e.g.*, Defs. Mem. at 6 (faulting plaintiff for failing to "offer[] specifics"). Each side cites to a series of Seventh Circuit cases supposedly supporting their respective positions, and they further argue over whether each case is factually analogous. As set forth below, we are persuaded by the larger point -- namely, that plaintiff has met the notice pleading standards and that there is enough evidence to justify going forward with discovery. We therefore will only offer a brief explanation now and will not engage in a detailed analysis of the case law because these issues can be better addressed (if appropriate) on a motion for summary judgment at which time we will have a fuller understanding of all the relevant facts and can then analyze the case law in more detail.

As to plaintiff's argument that there was a widespread custom or practice of discrimination, defendants argue that there is insufficient evidence that the City *policymakers* (as opposed to the individual defendants in the Ogden CDOT office) were aware of this discrimination or that they failed to take steps to stop it. While we agree with defendants that plaintiff's allegations are fairly general, we nonetheless find them sufficient. As defendants concede in their reply, at p.7 n.11, plaintiff has alleged (among other things) that she complained about the Ogden office behavior to "all of" the City Aldermen. Defendants respond that there is not enough detail about the specific way these complaints were communicated to the Aldermen nor enough detail about exactly what was said in them. Similarly, the non-Annunzio defendants argue that the complaints came too late after the discrimination began and were therefore unlikely to do much good. (Defs.

| STATEMENT |
|---|

Mem. at 7.) Perhaps these points will prove true in the end, but they are fact-based determinations that need further discovery to properly analyze. As plaintiff points out, the allegations of discrimination, which must be taken as true here, are serious -- Annunzio daily and openly used the word "Nigger" in the office; he wore a KKK-type hood in the office; and he kept minority employees physically segregated from white employees. Given these detailed allegations, we find more latitude ought to be given about what inferences are permissible regarding who knew what and when. This latitude is warranted in part because plaintiff will necessarily have to be more specific in responding to a summary judgment motion.

As for plaintiff's alternative argument that the individual defendants had policymaking authority, defendants argue that, while the individuals may have had authority to *implement* policy, only the City Council and Commissioner of Human Resources had authority to *make* policy in the area of employment. (Defs. Reply at 4; *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009).) Although defendants accurately state the law and make a number of good arguments, we still find that it is better to allow this issue to be resolved on summary judgment, largely for the reasons set forth above. Along this line, we note that *Waters*, one of the key cases relied upon by defendants, concerned a motion for judgment made after the case had been tried to the jury. *Id.* at 580.

**Evidence Regarding Intent.** Defendants argue that there is insufficient evidence that the individual non-Annunzio defendants acted with discriminatory intent. Plaintiff again responds by pointing to what she calls the "shocking race discrimination" allegations and argues that, at this early stage in the case, it is reasonable to give her the benefit of the doubt and infer that this degree of discrimination was intentional. We agree.

**First Amendment Claims.** In two of her counts, plaintiff asserts a First Amendment claim under § 1983, alleging that when she complained about the discrimination to the Alderman, Mayor, and union official, she was engaging in her right as a *private citizen* to speak out about a matter of *public concern*. *See generally Garcetti v. Ceballos*, 547 U.S. 410 (2006). Again, the parties largely agree on the relevant legal framework, and instead argue primarily about whether the allegations are specific enough for plaintiff to meet her burden of showing, among other things, that she was speaking as a private citizen about an issue of public concern, rather than merely as an employee dissatisfied with her own personal working conditions. Plaintiff argues that she complained outside the normal channels and complained to defendants in her capacity as a union representative. (Pl. Resp. at 14; Cmplt. ¶¶ 27, 71, 78.)

Here again, we find that dismissing the case would be premature. The facts are not fully developed, and these inquiries often turn on context. This point is reinforced by the Supreme Court's admonition that courts should approach these questions by taking a "practical view." *See* Defs. Reply at 11 (citing *Garcetti*). To take a practical view typically requires a broader understanding of the specific factual context in which the statements were made. Defendants also argue that, although plaintiff claims she was acting as a union steward, this "clearly" cannot be true because she made only a "passing reference" to this fact in her complaint. *See* Defs. Reply at 12 (distinguishing the *Shefcik* case). While defendants' intuition may ultimately be proven correct, we cannot rely on it now. It is also an issue that can be fleshed out relatively easily in discovery. For all the above reasons, the two motions to dismiss are denied.